IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Jane Doe H.,

          Plaintiff,

          vs.                   Case No. 16-2727-JTM

Haskell Indian Nations University, *et al.*,

          Defendants.

MEMORANDUM AND ORDER

Plaintiff Jane Doe H. attended Haskell Indian Nations University in Lawrence, Kansas from 2014 to 2016. Haskell is a unique federally-owned university, providing tuition-free higher education to members of recognized Indian Nations. [1] Doe brings the present action against Haskell, the United States, the Secretary of the Department of Interior, and two individual Haskell officers and one Haskell employee. [2]

---

[1] The court has previously recognized Haskell as "a four year college … under the control and management of the United States Department of the Interior, Bureau of Indian Affairs," whose "[i]nstructors … are federal employees governed by federal rules and regulations." *John v. Lujan*, 1992 WL 41354, *1 (D. Kan. Feb. 16, 1992). *See also State v. LaPier*, 242 Mont. 335, 342 (1990) ("Haskell admits persons of one-fourth or more Indian blood and the federal government pays the student's educational expenses").

[2] Venida Chenault is the President of Haskell. Tonia Savnini is Haskell's Vice President of University Services. Elyse Towey is the college's Title IX coordinator.

The plaintiff alleges in her complaint that she was subjected to a sexual assault by two male students at a dormitory in November of 2014. After an investigation, the male students were criminally charged. (Dkt. 1, ¶¶ 16-18). Haskell provided plaintiff counseling and support for the next sixteen months, and the complaint identifies no actions by defendants during that period which support her claims for relief. (*Id.*, at ¶¶ 21-22).

On March 31, 2016, the complaint alleges that plaintiff experienced a physical altercation with a third male student. The male student reported that plaintiff assaulted him. Plaintiff alleges that university officers pressured the male student to file Title IX charges against her, even though the officers did or should have known that she was the victim of the altercation. (*Id.*, at ¶¶ 26-27).

University administrators issued an order to plaintiff that she should have no contact with the male student. Plaintiff alleges that the she was constructively expelled and banned from campus without any additional investigation. (*Id.*, at ¶¶ 32-33). Plaintiff alleges she was not allowed any opportunity to oppose this decision prior to the constructive expulsion. Plaintiff withdrew from the university and did not engage in any subsequent appeal or procedural opposition to the administrator's actions. Plaintiff filed the present action on October 24, 2016.

In the complaint, the plaintiff raises three claims against the Secretary, Haskell, and the United States:  (Count 1) that she was subjected to a hostile educational environment at Haskell in violation of Title IX; (Count 2), that they violated her rights under Title IX by retaliating against her; and (Count 6), that they violated her rights

under the Rehabilitation Act by constructive expelling, even though they knew she was mentally traumatized by the 2014 assault. Against the individual defendants, plaintiff brings *Bivens* claims for (Count 3) deprivation of due process,[3] (Count 4) violation of her equal protection rights, and (Count 5) violated her privacy rights by providing copies of her Haskell records, without a subpoena, to defendants' counsel during the June, 2016, trial of the students involved in the alleged 2014 assault.

All of the defendants have moved to dismiss the action. Citing *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605–06 (1986), the government[4] argues that the plaintiff's claims against it are precluded by sovereign immunity, and alternatively that plaintiff's Title IX and Rehabilitation Act claims are inapplicable, since Haskell is not an institution receiving federal assistance within the meaning of those statutes. The individual defendants argue that plaintiff's claims are not appropriate *Bivens* actions, and alternatively that defendants are protected by qualified immunity. All defendants argue that, even if plaintiff's claims are otherwise properly before the court, her allegations fail to support the claims presented.

The plaintiff responds to the government's argument by contending that it has misapprehended *Paralyzed Veterans*, and focuses on the Court's reference in that case to its earlier decision in *Grove City College v. Bell*, 465 U.S. 555 (1984). According to the plaintiff, *Paralyzed Veterans* merely held that a private entity (an airline) receiving an

---

[3]  In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388  (1971), the Supreme Court recognized an implied cause of action against federal agents for violations of a plaintiff's constitutional rights.

[4] Because Haskell is a federally owned and operated agency of the United States, plaintiff's denomination of separate defendants in Counts 1, 2, and 6 serves no purpose. All of these claims are claims against the United States.

indirect benefit from federal airport construction assistance, was outside the reach of Section 504 of the Rehabilitation Act. She contends that *Grove City*, which involved student financial assistance under Title IX, is the more relevant decision.

In *Paralyzed Veterans*, the Court rejected an argument by the plaintiffs that *Grove City* supported their position by distinguishing the nature of the federal assistance in the earlier decision:

> This argument confuses intended *beneficiaries* with intended *recipients*. While we observed in *Grove City* that there is no "distinction between direct and indirect aid" and that "[t]here is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the Federal Government are subject to regulation," we made these statements in the context of determining whom Congress intended to receive the federal money, and thereby be covered by Title IX. 465 U.S., at 564, 104 S.Ct., at 1217. It was clear in *Grove City* that Congress' intended recipient was \*607 the college, not the individual students to whom the checks were sent from the Government. It was this unusual disbursement pattern of money from the Government through an intermediary (the students) to the intended recipient that caused us to recognize that federal financial assistance could be received indirectly. While *Grove City* stands for the proposition that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly, it does not stand for the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid. In this case, it is clear that the airlines do not actually receive the aid; they only benefit from the airports' use of the aid.

477 U.S. at 605–06.

The court finds that *Grove City* does not support an exercise of jurisdiction over the plaintiff's claims in the present action. First, in *Grove City* the Court had stressed the distinct nature of the federal assistance in question – Basic Education Opportunity Grants (BEOGs) which were made payable to students but which inevitably flowed into the defendant college's financial aid program. "The BEOG program was designed, not

merely to increase the total resources available to educational institutions, but to enable them to offer their services to students who had previously been unable to afford higher education." *Grove City*, 465 U.S. at 573. The Court determined under the circumstances of the case that the government could enforce Title IX's certification requirements, but only against the college's financial aid program, not against the college itself:

> It is true, of course, that substantial portions of the BEOGs received by Grove City's students ultimately find their way into the College's general operating budget and are used to provide a variety of services to the students through whom the funds pass. However, we have found no persuasive evidence suggesting that Congress intended that the Department's regulatory authority follow federally aided students from classroom to classroom, building to building, or activity to activity…. We conclude that the receipt of BEOGs by some of Grove City's students does not trigger institution-wide coverage under Title IX. In purpose and effect, BEOGs represent federal financial assistance to the College's own financial aid program, and it is that program that may properly be regulated under Title IX.

*Id*. at 573-74.

In the present case, the financial assistance provided by the federal government is far more indirect than in *Grove City*. Haskell is a unique national institution of higher learning for Native Americans. It provides a tuition-free education for members of indigenous Nations, and any federal assistance takes the form of Pell Grants or other assistance for limited expenses, such as books and lodging, which students may otherwise incur.

More importantly for present purposes, *Grove City* involved an effort by the government to enforce Title IX's certification requirement against a private college. As a result, the decision provides no guidance as to whether Congress has waived the

federal government's sovereign immunity as to actions for monetary damages arising under Title IX.

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota*, 461 U.S. 273, 287, (1983). Such a waiver of sovereign immunity must be "unequivocally expressed" in statutory text. *See, e.g., Lane v. Peña*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). Any ambiguities in the statutory language are to be construed in favor of immunity. *United States v. William*s, 514 U.S. 527, 531, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995). If there is any doubt, waiver will not be found because waiver cannot be implied, assumed, or based upon speculation, surmise, or conjecture. *United States v. Kin*g, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

By separate statute, Congress has explicitly stated that "[a] State shall not be immune under the Eleventh Amendment of the United States from suit in federal court" for violations of Title IX and Section 504 of the Rehabilitation Act. 42 U.S.C. § 2000d-7(a)(1). *See, e.g., Franks v. Ky. Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998) ("Congress successfully abrogated the states' Eleventh Amendment immunity from Title IX lawsuits"). But Congress has not explicitly waived sovereign immunity by the federal government for such actions.

Thus, "Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, and the False Claims

Act do not waive the sovereign immunity of the United States." W*ije v. Texas Woman's Univ.*, No. 4:14-CV-571-ALM-CAN, 2015 WL 9872534, at *8 (E.D. Tex. Dec. 22, 2015), *report and recommendation adopted*, No. 4:14-CV-571, 2016 WL 231151 (E.D. Tex. Jan. 19, 2016) (as to his claims under "Title IX of the Education Amendments of 1972 [and] Section 504 of the Rehabilitation Act … against the United States Department of Education … Plaintiff has not satisfied his burden to demonstrate the immunity of the United States has been (or could have been waived) here").

In *Lane*, 518 U.S. at 192, the Supreme Court concluded that "[t]he clarity of expression necessary to establish a waiver of the Government's sovereign immunity against monetary damages for violations of § 504 is lacking." The Court stressed that Congress explicitly waived federal sovereign immunity in 29 U.S.C. § 791 for Rehabilitation Act cases charging disability in employment discrimination under Section 501. In contrast, in the remedies provision for Section 504 cases,

> Congress decreed that the remedies available for violations of Title VI would be similarly available for violations of § 504(a) "by any recipient of Federal assistance or Federal provider of such assistance." 29 U.S.C. § 794a(a)(2). This provision makes no mention whatsoever of "program[s] or activit[ies] conducted by any Executive agency," the plainly more far-reaching language Congress employed in § 504(a) itself. Whatever might be said about the somewhat curious structure of the liability and remedy provisions, it cannot be disputed that a reference to "Federal provider[s]" of financial assistance in § 505(a)(2) does not, without more, establish that Congress has waived the Federal Government's immunity against monetary damages awards beyond the narrow category of § 504(a) violations committed by federal funding agencies acting as such—that is, by "Federal provider[s]."

*Id*. at 192-93.

The Court also rejected the plaintiff's argument resting on earlier decisions such as *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992) recognizing an implied right of action under Title IX against the recipients of federal financial assistance. *Franklin*, the Court observed:

> involved an action *against nonfederal defendants* under Title IX. Although the Government does not contest the propriety of the injunctive relief Lane obtained, the Federal Government's sovereign immunity prohibits wholesale application of *Franklin* to actions against the Government to enforce § 504(a). As the Government puts it, "[w]here a cause of action is authorized against the federal government, the available remedies are not those that are 'appropriate,' but only those for which sovereign immunity has been expressly waived."

*Id*. at 196 (emphasis added).

The plaintiff has failed to point to any statutory language indicating a clear and unequivocal intent by Congress to expressly waive sovereign immunity. The court concludes that the plaintiff's claims under Title IX and the Rehabilitation Act should be dismissed.

In addition, the court finds that the plaintiff's due process and equal protection *Bivens* actions against the individual defendants should be dismissed.

In response to the defendants' motions to dismiss, the plaintiff addresses in detail only that portion in which defendants seek dismissal under Rule 12(b)(6) — that the factual allegations in the Complaint (or proposed Amended Complaint) fail to set forth actionable due process and equal protection claims. The plaintiff wholly ignores the question of whether a *Bivens* action is appropriate in this case, other than a single passage in each brief (Dkts. 54, 58, and 59, at 8, 24) citing cases in which Bivens actions

have been permitted to proceed. *See Davis v. Passman*, 442 U.S. 228 (1979) (due process);

*Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001) (equal protection).

But this is insufficient. The plaintiff fails to note that cases such as "*Davis …*

represent the high-water mark in the Court's *Bivens* jurisprudence," after which

Supreme Court "has steadfastly retreated from a broad application of the doctrine,

refusing to extend implied causes of action to other constitutional provisions, and

cabining the contexts in which it will allow *Bivens* claims to proceed." *Big Cats of*

*Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 859 (10th Cir. 2016). *See Ziglar v. Abbasi*, 137

S.Ct. 1843, 1855 (2017) ("*Bivens*, *Davis*, and *Carlson*, [446 U.S. 14 (1980)] represent the

only instances in which the Court has approved of an implied remedy under the

constitution itself").

As the Supreme Court emphasized in its recent decision in *Ziglar*, courts must

exercise caution before implying a constitutional remedy:

> [I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation. When determining whether traditional equitable powers suffice to give necessary constitutional protection—or whether, in addition, a damages remedy is necessary—there are a number of economic and governmental concerns to consider. Claims against federal officials often create substantial costs, in the form of defense and indemnification. Congress, then, has a substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government. In addition, the time and administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered. In an analogous context, Congress, it is fair to assume, weighed those concerns in deciding not to substitute the Government as defendant in suits seeking damages for constitutional violations.

For these and other reasons, the Court's expressed caution as to implied causes of actions under congressional statutes led to similar caution with respect to actions in the *Bivens* context, where the action is implied to enforce the Constitution itself. Indeed, in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today....

Given the notable change in the Court's approach to recognizing implied causes of action, however, the Court has made clear that expanding the *Bivens* remedy is now a "disfavored" judicial activity. [*Ashcroft v. Iqbal*], 556 U.S. {662,] 675 [(2009)]. This is in accord with the Court's observation that it has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Indeed, the Court has refused to do so for the past 30 years.

137 S.Ct. at 1856-57.

The plaintiff's response does not address the mandatory two-step analysis required by the Supreme Court, under which the court must "carefully consider the facts and context" of the specific case before it. *Id*. at 860. This test follows from the Court's explicit cautioning that claims for damages under *Bivens* must "represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest," and thus "in most instances we have found a Bivens remedy unjustified." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

Under this two-step analysis, the court first determines whether an "alternative, existing process for protecting the [plaintiff's] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. *See also  Minneci v. Pollard*, 565 U.S. 118 (2012); *Ziglar*,

137 S.Ct. at 1863 ("when alternative methods of relief are available, a *Bivens* remedy usually is not"). Second, even if there is no alternative remedy, the court may still decline to entertain an action for damages if there are "special factors" which counsel hesitation, "weighing reasons for and against the creation of a new cause of action, the way common law judges have always done." *Id*. at 554.

> "The point of examining the existing process is to determine whether Congress has explicitly or implicitly indicated 'that the Court's power should not be exercised.'" *De La Paz v. Coy*, 786 F.3d 367, 375 (5th Cir. 2015), cert. filed, (Jan. 12, 2016) (quoting *Bush* [*v. Lucas*], 462 U.S. [367,] 378 [(1983)]. Congress may explicitly "indicate its intent[ ] by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself, that the Court's power should not be exercised." *Bush*, 462 U.S. at 378, 103 S.Ct. 2404. But Congress may also *implicitly* indicate intent "by creating a process that provides 'an avenue for some redress'" for injured persons, and "[i]n these instances, 'bedrock principles of separation of powers' show that 'Congress expected the Judiciary to stay its *Bivens* hand' and instead apply the statutory remedy." *Koprowski v. Baker*, 822 F.3d 248, 262 (6th Cir. 2016) (Sutton, J., dissenting) (quoting *Malesko*, 534 U.S. at 69, 122 S.Ct. 515; *Wilkie*, 551 U.S. at 554, 127 S.Ct. 2588). Thus, in analyzing whether a *Bivens* claim is precluded by an alternative remedy, courts must consider the nature and extent of the statutory scheme created by Congress, and assess the significance of that scheme in light of the factual background of the case at hand. *See Wilkie*, 551 U.S. at 551, 127 S.Ct. 2588; *see also De La Paz*, 786 F.3d at 375.

*Big Cats*, 843 F.3d at 860-61 (emphasis in original).

Such an alternative remedy exists in the present action. On June 23, 2000, President Clinton by executive order required that "[t]he Federal Government must hold itself to at least the same principles of nondiscrimination in educational opportunities as it applies to the education programs and activities of State and local governments, and to private institutions receiving Federal financial assistance." Exec. Order 13160, 65 F..R. 39775, 2000 WL 34508162, § 1. Consistent with this obligation, the

11

Executive Order prohibits a wide range of discriminatory actions "in Federally conducted education and training programs and activities." *Id*. Haskell Indian Nations University is a federally conducted education program, and is subject to the provisions of the order.

Executive Order 13160 both prohibits discrimination, § 1-102, and provides procedural due process rights to persons receiving federally conducted education. *Id*. at § 4. Specifically, the Order provides:

> Any person who believes himself or herself to be aggrieved by a violation of this order or its implementing regulations, rules, policies, or guidance may, personally or through a representative, file a written complaint with the agency that such person believes is in violation of this order or its implementing regulations, rules, policies, or guidance. Pursuant to procedures to be established by the Attorney General, each executive department or agency shall conduct an investigation of any complaint by one of its employees alleging a violation of this Executive Order.

*Id*. at § 4-401. Following this mandatory investigation, any findings that a federal employee has violated the Order, along with all supporting evidence, is given to the federal agency in charge of the education program. The agency may then take "any corrective or remedial action;" the only limitation on such corrective action is the qualification that "[n]othing in this order authorizes monetary relief" as damages. *Id*. at § 4-402. On the other hand, the Executive Order also provides that corrective action may include "[a]ny action to discipline an employee who violates this order or its implementing rules, regulations, policies, or guidance, including removal from employment." *Id*. at § 4-403. Administrative decisions under the Order are subject to judicial review. *Id*. at § 8-801.

12

Administrative relief under Executive Order 13160 does not include monetary compensation, but in determining whether a *Bivens* action is appropriate, "there is no need for congruent remedies or even money damages." *Big Cats*, 843 F.3d at 862-63. Rather, the inquiry is whether the alternative, existing procedure shows Congress's *intent* to exclude a damages remedy," which may exist if the procedure encompasses both "adequate deterrence and at least *some* form of relief for the harm." *Id*. at 862 (citations omitted, emphasis in *Big Cats*).

Here, Executive Order 13160 authorizes "any corrective or remedial action" except monetary damages, and explicitly provides that responsible federal employees may be disciplined or terminated. Of course, Executive Order 13160 is not an act of Congress. However, as noted earlier, in determining whether to imply a *Bivens* remedy, the court must also look to "*implicit*[] indicat[ions]" of Congressional intent, *see id*. at 860, and in this context it is notable that, nearly two decades after Executive Order 12160, Congress had made no attempt to provide for a damages remedy against federal employees involved in education and training programs, or otherwise alter the procedures adopted in the Executive Order. *See Ziglar*, 137 S.Ct. at 1862 (observing, in rejecting a *Bivens* claim by foreign nationals for illegal detention, that "in any inquiry respecting the likely or probable intent of Congress, the silence of Congress is relevant; and here that silence [in failing to create any damages remedy for such detainees "for nearly 16 years" since 9/11] is telling").

The plaintiff supplies no argument as to why Executive Order 13160 would not be an adequate alternative remedy within the meaning of *Wilkie*. Indeed, plaintiff's Responses to the defendants' motions to dismiss do not even mention the order.

Because the court determines that plaintiff's claims against the federal government are barred by sovereign immunity, and plaintiff has failed to justify prosecution of the claims against the individual defendants as monetary damages claims under *Bivens*, the court dismisses these claims.

Also before the court is the plaintiff's Motion to Amend (Dkt. 52), which seeks leave for the filing of an Amended Complaint. Recognizing authority that privacy claims are not actionable against individual federal employees under *Bivens* in light of the Privacy Act (which does explicitly waive sovereign immunity for claims against the government under the Act) , the Amended Complaint voluntarily dismisses the Count 5 Privacy Act claim against Towey, Salvini, and Chenault, and adds a new Count 7 claim against the United States for violation of the Act.

Ordinarily, if a party to seeks to amend her pleadings, the "court should freely give leave when justice so requires." Fed. R. Civ. P. 15 (a)(2). Defendants oppose the motion (Dkt. 63), arguing that the facts presented in the proposed Amended Complaint were known before plaintiff filed her original complaint, and that the proposed changes "are nothing more than a transparent attempt to move the target to avoid dismissal." (Dkt. 63, at 3). *See State Distribs., Inc. v. Glenmore Distilleries* Co., 738 F.2d 405, 416 (10th Cir 1984) (motion to amend may be denied "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is

14

based but fails to include them in the original complaint, the motion to amend is subject to denial").

The court grants leave for the filing of the Amended Complaint. The proposed Amended Complaint amplifies certain allegations about the conduct of the individual defendants, but does not fundamentally alter or change any prior allegation of fact. However, since the additional factual allegations seek to respond to defendants' motions to dismiss for failure to state a claim under Fed.R.Civ.Pr. 12(b)(6) — an issue which the court need not reach — they do not affect the court's conclusions as to sovereign immunity and the propriety of an action for *Bivens* against the individual defendants.

Accordingly, the court dismisses all claims in the original and amended complaint except the newly-presented Count 7 Privacy Act claim against the government.

Plaintiff has separately moved for leave to continue to prosecute this action under the Jane Doe pseudonym. She notes that the Tenth Circuit has upheld the use of pseudonyms in certain cases, *see Lindsey v. Dayton-Hudson Corp.*, 592 F.2d 1118 (10th Cir. 1979), cert. den. 444 U.S. 856; *Coe v. U.S. Dist. Court of Dist. Of Colorado*, 676 F.2d 411 (10th Cir. 1982); *M.M. v. Zavaras*, 139 F.3d 798, 800 (10th Cir. 1998), quoting that court's decision in *Lindsey*:

> This use of pseudonyms concealing plaintiffs' real names has no explicit sanction in the federal rules. Indeed it seems contrary to Fed.R.Civ.P. 10(a) which requires the names of all parties to appear in the complaint. Such use obviously may cause problems to defendants engaging in discovery and establishing their defenses, and in fixing res

judicata effects of judgments. Yet the Supreme Court has given the practice implicit recognition in the abortion cases, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), with minimal discussion. Most of the cases permitting the practice have involved abortion, birth control, and welfare prosecutions involving abandoned or illegitimate children. We have found only a few cases where the propriety of the technique was discussed.

….

While the issue is not free from doubt we think all cases we reviewed implicitly, at least, recognize that identifying a plaintiff only by a pseudonym is an unusual procedure, to be allowed only where there is an important privacy interest to be recognized. It is subject to a decision by the judge as to the need for the cloak of anonymity.

592 F.2d at 1125.

However, the plaintiff omits language from *Lindsey* which clarifies that court's recognition that there is a presumption in favor of disclosure of a party's name. Approvingly citing *Doe v. Deschamps*, 64 F.R.D. 652 (D. Mont. 1974) for its collection of relevant cases, the *Lindsey* court explicitly agreed that "the public generally has a right to know [the identity of litigants]," and "refuses to permit [the use of pseudonyms] except in unusual cases." 592 F.2d at 1125. Moreover, it may be noted that in each of the cited cases, the Tenth Circuit ultimately upheld the determination of the district court that no pseudonym should be used. *See Lindsey, id.*, (affirming decision not to permit pseudonym where "Lindsey had already suffered the worst of the publicity and embarrassment by being a named defendant in a state criminal trial"); *Coe,* 676 F.2d at 418 (in action by doctor challenging disciplinary action by state board, "District Court did not err in finding that Dr. Coe's interest in privacy is outweighed by the public interest"); *Zavaras*, 139 F.3d at 800 (pseudonym not required where "plaintiff's identity

is already known to the state agency and staff" and "we believe that the prejudice to the public interest is clear, should the district court have allowed plaintiff to proceed under a fictitious name").

Plaintiff presents only one decision in which the court has upheld the use of a pseudonym, *J.B. v. Liberal School District, USD No. 480*, Case No. 06-2359-MLB (September 20, 2006). However, *J.B.* carries little persuasive weight. The cited order permitting the use of pseudonym was issued *ex parte* by the assigned magistrate judge, shortly after the case was filed and without any opportunity for the defendants to respond. More importantly, according to the complaint in that action, the plaintiff "was at all relevant times a minor," defendants were officers in a small-town secondary school district who were aware of a coach's "dangerous propensities to abuse children," that they nonetheless allowed coach to "us[e] his role as a coach and youth mentor" to sexually abuse plaintiff who was "between the ages of 12 and 15." (Dkt. 1, ¶¶ 5, 13, 95, 111). Both the plaintiff's motion to proceed by pseudonym (Dkt. 3, at 2) and the magistrate judge's *ex parte* order stressed that the plaintiff sought recovery for "alleged sexual abuse and assault he suffered as a child." (Dkt. 5, at 2).

Here, the Complaint does not allege that the plaintiff is a minor. *See Doe v. Cabrera*, 307 .F.R.D. 1, 7 (D.D.C. 2014) ("Where victims are not minors, courts are generally less inclined to let the alleged victim proceed in litigation under a pseudonym."); *Doe v. Porter*, 370 F.3d 558, 561 (6th Cir.2004) (district court did not abuse its discretion in allowing pseudonym where case was "brought on behalf of very young children, to whom we grant a heightened protection").

The Complaint in the present action alleges that plaintiff's 2014 complaint resulted in criminal charges against two Haskell students, but does not indicate how those charges were resolved or whether she was publicly identified. The defendants oppose the motion to proceed by pseudonym, and represent that

> [t]he facts and circumstances of this case are known in the community and the identities of the individuals involved have been revealed in multiple court proceedings including three trials. The individuals Plaintiff accuses of rape have been tried, but not convicted, and Plaintiff has testified in open court regarding this matter at least three times.

(Dkt. 61, at 3).

In her Reply, plaintiff only partially challenges these representations. She asserts that one of the male students involved in the alleged 2014 incident has pled guilty to aggravated battery, but not rape, (Dkt. 69, at 2), and points out that "[t]he news media have not reported [her] name as a complaining witness." *Id*. at 3-4. Plaintiff does not contest the representation that plaintiff has testified in open court during three trials, and that the facts are generally known in the Lawrence community. And the absence of any reporting may indicate media disinterest rather than restraint. Plaintiff has failed to show any likelihood that the news media are interested in or would report on the present action.

The Complaint alleges plaintiff suffered emotionally from the assaults and the alleged misconduct of the defendants, but plaintiff supplies no evidentiary support for these claims in conjunction with her motion to proceed by pseudonym. (Dkt. 56). Rather, plaintiff's motion relies on her allegations alone. *Cf. Doe v. Bell Atl. Bus. Sys. Servs.*, 162 F.R.D. 418, 422 (D. Mass. 1995) (granting use of pseudonym in light of

18

"persuasive, substantive evidence demonstrating 'a compelling need for privacy ... [that] outweighs the rights of the defendants and the public to open proceedings'").

Moreover, the use of a pseudonym would likely be temporary at best. *See Doe v. Cabrer*a, 307 F.R.D. at 10 (granting use of pseudonym during preliminary stages of litigation but observing that allowing the use of a pseudonym during trial would serve "as a subliminal comment on the harm the alleged encounter ... has caused the plaintiff"); *E.E.O.C. v. Spoa, LLC*, 2013 WL 5634337, at *3 (D. Md. Oct. 15, 2013) (finding that during ultimate trial "grant of anonymity would implicitly influence the jury"). The plaintiff has failed to point to any specific injury which would arise from the use of her actual identity during the pretrial phase of the case.

Courts facing similar actions for sexual assaults or harassment by employers or in university settings have generally required adult plaintiffs to proceed in their own name. *See Doe v. Shakur*, 164 F.R.D. 359, 361–62 (S.D.N.Y. 1996); *Doe v. Bell Atlantic*, 162 F.R.D. 418, 422 (D. Mass. 1995); *Doe v. University of Rhode Island*, 1993 WL 667341, at *3 (D.R.I. Dec. 28, 1993); *Doe v. Hallock*, 119 F.R.D. at 640, 644 (S.D. Miss. 1987). This is the appropriate result here. The plaintiff is authorized and directed to proceed in the present action under her own name.[5]

---

[5] Defendants have moved for leave to file a surreply, in order to respond to the plaintiff's argument in her Reply (Dkt.69, at 2), that the government's opposition to the use of a pseudonym violates Department of Justice Guidelines, and further reflects defendants' "deliberate indifference to Plaintiff's privacy," and indeed a desire to "publicize this young woman's name."

Leave to file the surreply is granted. As the Surreply points out, the cited Guidelines merely indicate that government officers should refrain from publicly identifying witnesses, including sexual assault victims, in criminal cases. This is not a criminal action, but an action by the plaintiff seeking monetary damages. The burden is on the plaintiff to establish the need for the use of a pseudonym. As noted above, plaintiff has cited no authority for the proposition that an adult plaintiff asserting claims

Finally, the court notes that plaintiff has moved to seal any or all of defendants' summary judgment motion exhibits "that disclose Plaintiff's identity." (Dkt. 57, at 1). Plaintiff's motion rests on her that fact she "filed suit seeking anonymity," and that any records containing her name are records protected under the Family Education Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, 34 C.F.R. 99.1. However, plaintiff submits no authority for the blanket sealing of all exhibits which happens to bear her name. Generally, a student's name is considered "directory information" which is not protected under FERPA. *See* § 1232g(a)(5).

In support of her motion, plaintiff cites *State v. Bd. of Educ. of Unified Sch. Dist. No. 305, Saline Cty.*, 13 Kan. App. 2d 117, 120, 764 P.2d 459, 461 (1988), which determined that a Kansas school board did not violate the Kansas Open Meetings Act, K.S.A. 75-4317, by addressing an asbestos removal project, and administratrators involved in the removal, in executive session. The court finds the case is not relevant to the plaintiff's request for relief.

Plaintiff's blanket motion to seal is directly tied to her request to prosecute this action anonymously. As noted earlier, the request to proceed by pseudonym is denied. "[C]ourts have long recognized a common-law right of access to judicial records," which are presumptively available for public access. *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir.2007). Plaintiff has failed to overcome this presumption.

---

relating to an alleged sexual assault is automatically entitled to the use of a pseudonym. The weight of authority holds to the contrary.

Finally, the court rejects as wholly unfounded the insinuation that the defendants, simply by opposing her request for use of a pseudonym are otherwise seeking to "publicize" plaintiff's name.

IT IS ACCORDINGLY ORDERED this 17th day of July, 2017, that the plaintiff's Motion to Amend (Dkt. 52) and defendants' Motions to Dismiss (Dkt. 29, 31, 33, 35) and for Leave (Dkt. 70) are granted as provided herein; plaintiff's Motion to Proceed and to Seal (Dkt. 55, 57) are denied.


___s/ J. Thomas Marten_
J. THOMAS MARTEN, JUDGE